FILED

AUG 1 5 2024

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| TAMARA L. SOBOLEWSKI, | ) |
| Plaintiff, | ) Case No. |
| | ) **1:24 CV 01396** |
| v. | ) |
| | ) **JUDGE CALABRESE** |
| FORD MOTOR COMPANY, | ) |
| Defendant. | ) **MAG. JUDGE SHEPERD** |
| | ) |

## COMPLAINT

I, Tamara Sobolewski, bring this lawsuit against FORD MOTOR COMPANY ("Ford") for immediate and effective corrections of unlawful conduct.  I request Ford provide transition assistance, reverse other adverse actions, non-discriminatory placement, back pay, reasonable, foreseeable consequential damages, and reasonable cost of representing myself in redressing the deprivation of civil rights under major laws protecting Americans and me such as our **Labor Management Relations Act (LMRA) § 301 (29 U.S.C. § 185),** Americans with Disabilities Act of 1990, Title VII of Civil Rights Act of 1964 (Title VII), Age

1

Discrimination in Employment Act of 1967 (ADEA), Mental Health Parity and Addiction Equity Act (MHPAEA) and all applicable state and federal laws.

## PARTIES

1.    I, TAMARA SOBOLEWSKI, Plaintiff, am a citizen of Lorain, Ohio.

2.    Defendant Ford operates the Ohio Assembly Plant ("OHAP") in Lorain County, Ohio, and within this judicial district.

## JURISDICTION AND VENUE

3.    The authority of this court is invoked because this matter involves a federal question or because this action arises under federal laws.

4.    The venue is proper in this district because events giving rise to these claims occurred at Ford's assembly plant in Avon Lake, Ohio ("OHAP") within the Northern District of Ohio, and Ford resides in this judicial district.

## I AM A MEMBER OF THE UAW

5.    Ford and the UAW are parties to a collective bargaining agreement.

6.    Ford introduced a Modern Operating Agreement ("MOA"). *See* Public Review Board ("PBR") Case Nos. 1526 and 1542 (2006), p. 1 at https://prbuaw.org/2020/02/donovan-et-al-v-uaw-ford-dept/ or 1526 & 1542 Donovan et al. v. UAW Ford Dept. - Public Review Board (prbuaw.org)

7.    My relationship with Ford is governed by *AGREEMENTS between UAW and the FORD MOTOR COMPANY* ("CBA")[1], federal and state laws.

(a)    Relevant paragraphs – CBA Vol. I, *Article IV § 3*, p. 17 (2003):

Ford retains the sole right to discipline and discharge employees for cause, provided that in the exercise of this right it will not act wrongfully or unjustly or in violation of the terms of this Agreement.

Complaints that the Company has violated this paragraph may be taken up through the Grievance Procedure provided in this Agreement.

(b)    Administrative changes to *Article IV § 3*, p. 17 (2007):

However, in instances where an employee is on a medical leave of absence of 90 days or more ... the 18 months will be extended by the amount of time of medical leave occurring within the initial eighteen months to ensure 18 months of active employment from the issuance of the disciplinary action.

(c)    Relevant paragraphs CBA Vol. I, *Article VII §3(e)*, p. 48 (2019):

The Unit Committee shall have the power to withdraw a Second Stage Grievance, and the designated Company representative shall have the power to adjust a Second Stage Grievance.

(d)    Relevant paragraphs from Vol. I, *Article X § 9*, p. 134 (2015):

...for the handling of any claims of discrimination...the grievance and arbitration procedure shall be the exclusive contractual procedure for remedying such discrimination claims.

---

[1] note: Copies of our 2019 and 2023 Agreements are available online at https://uaw.org/ford2023/

3

(Exhibit ("Exh.") 1 – Copy of the relationship we developed pp. 44-55, CBA Appendix C (2003) ...Appendix C (2015) ...CBA Vol. I Appendix S § *Memorandum of Understanding for the Health and Safety of Employees* pp. 274, 283, 291, 304 (2015) ...CBA Vol. IV-A *Sexual Harassment* policy clarification (2019) attached and incorporated as if fully restated.)

8.      Our latest agreement is online at https://uaw.org//ford2023/.

9.      On or about 10/19/1992, I started working with Ford in a factory – Contract Unit 2 as a Level I Vehicle Assembly Technician ("Autoworker or Employee") when I was Caucasian, Female, 22 years old, and pregnant.

10.     For over twenty-seven years Ford Employees – our Unit Structure[2] – protected and enforced Employees' rights under our CBA.

11.     Ford provided me with welfare plans i.e., health, disability, and death benefits, prepaid legal services, vacation benefits, education and training benefits, a fitness center, and other similar benefits.

12.     The credits I earned in the UAW-Ford pension benefit plan are 27.4.

---

[2]  John Bado, Ed Baire, Bob Bell, Herb Bennett, Jay Bowen, Brynn Brummitt, David Candelario, Dave Cary, David Cooke, Tanya de Almeida, Amy Janes Brown, Dave Candlerio, Dave Cary, Bruce Click, Gary Cooper, Justo Delgato, Jerry Donovan, Michael Donovan, Paul Donovan, Tim Donovan, Brian Dorsey, Roy Escandon, Annette Fuller, Nick Gallogly, Clyde Hescox, John Hunter, Andrea Jewell, Tim Johnson, Laura Jones, Marvin Jones, Kelly Knight, Ken Kruse, Bob Kurtz, Chris Ladikos, Will Marcum, Brian Maust, Brian Mitchell, John Pena, Fred Pena III, Gerald Pippens, Michael Piscione, Paxton Rose, Ron Rowe, Tim Rowe, Tom Rowe, Shawn Salmons, Bill Samples, Michelle Schnurr, John Stafford, Michael Stempowski, Paul Triplett, Janice Williams, Jason Williams, Jerome Williams, Mark Wells, Denise Wedeman, Jason Wells, Steve Wonder, Bruce Yates, and others.

*See* Exh. 2 Age verification, 2017 Award and photograph (Photographer Unknown), my Credited Service, and Occupational History attached and incorporated as if fully restated.

## FORD HAS A PATTERN OF DISCRIMINATION

13.    Ford approved a landmark discrimination settlement (EEOC, 2005).

14.    Ford sued for discrimination (EEOC, 2011).

15.    Ford settled a harassment investigation (EEOC, 2017).

16.    Ford resolved discrimination (EEOC, 2019).

17.    Ford settled discrimination (EEOC, 2022).

*See* Exh. 3 attached Press Releases are incorporated as if fully restated.

18.    Our grievance procedure, Article VII, has four phases: First is oral discussions; Second is appeals of oral discussion that are not satisfactorily resolved and entail written grievances that are presented to a company representative at a grievance meeting; Third are appeals of unsatisfactory Second Stage Grievances to a plant appeal board with detailed statements of fact and positions and result in a written decision by the board; and finally, Fourth are disputes appealed to an "impartial Umpire." See *Campbell-Salahuddin v. Ford Motor Co.*, No. 18 C 268, 4 (N.D. Ill. Jan. 11, 2019).

19.     On or about 3/4/2019 from 6 AM to the end of our shift on 2/19/2020, I worked right with Body Shop Assemblers.[3]

20.     In 2020, Ford's Human Resources ("HR") Manager <u>Ryan Perniciaro</u> was the senior-ranking employee in the grievance chain at OHAP.

21.     Ford established H & S emergency response plans and employed plant Security Guards.  *See* Exh. 1 CBA Appendix S, pp. 283, 304 (2015).

22.     Around 1/12/2020, I received a W-2 from UniCare® for Ford which showed that I collected $10,188 in third-party sick pay because I missed approximately eleven weeks of 2019 active employment.  *See* Exh. 4 UniCare® W-2.

## I PARTICIPATED IN AN ACTIVITY PROTECTED BY TITLE VII

23.     Around 2/3/2020, I called the Ford Harassment Hotline ("Hotline"), and around 2/4 at 11:27 AM, the Hotline returned my call and left me a voicemail.

24.     Around 2/5/2020 at 1:20 PM, I spoke to the Hotline and reported employment challenges, i.e., lack of support, repeated discipline, demotion, and exclusion from diversity and inclusion policies.  *See* Exh. 4 Hotline Information Form.

---

[3] Jacob Bahnsen, Gerald Cole, Mark Criss, James Dalgleish, Larry Davis, Oval Hardwick, Richard Lence, Danielle Long, Myrle Sheldon, Carrieann Walend and our immediate supervisor Steve Jaeger and Rep Wells, collectively "Metal Line or Group 1315-2-J."

25.    Starting on 2/6/2020, I believed a team was *investigating* my Hotline complaint and *planning* prompt corrective action. *See* Exh. 1 CBA Vol. IV-A, p. 524 (2019) an investigation team will be formed within five working days.

26.    Around 2/7/2020, at 8:59 AM, Brian Maust facilitated Ford's adverse actions against me, settling and closing Discipline Grievance Nos. JW10318TS, CC343731, SS13119, SS2719TS, TS15KK and Discrimination Grievance No. SS21219TS, which had been filed on my behalf. *See* Exh. 1 CBA Vol. I, Article VII § 3(e), p. 48 (2015) the Unit Committee shall have power to withdraw a Second Stage Grievance.

## I WENT ON PARTICIPATING IN PROTECTED ACTIVITY

27.    Around 2/11/2020, at 9:04 PM, I responded to Maust, expressing that I felt targeted and paranoid due to the treatment of injured employees and my own experiences and conveyed my desire to advocate for all of us feeling targeted, specifically mentioning Lawanda King, Myra Wilson, and Michael Sherry. *See* Exh. 4 Maust email attached and incorporated as if fully restated.

## WE PARTICIPATED IN PROTECTED ACTIVITY

28.    Around 2/12/2020, at 10:10 AM, Ryan Perniciaro *called* Jason Wells and me to his office, *interviewed* me regarding my Hotline complaint, and *committed* to follow up with us on 2/20/2020.

29.     On or about 2/12/2020, at 5:36 PM, UAW Region 2B Representative Steve Frammartino *confirmed* that <u>Ryan Perniciaro</u> would get back to *us* and that Jason Wells would represent *my* interests properly.  *See* Exh. 4 Frammartino email attached and incorporated as if fully restated.

## COERCED RETIREMENT

30.     On or about 2/12/2020, at 6:32 and 8:22 PM, Ms. M.T. Doe was concerned about our sister, M.A. Doe ... they were trying to throw her out ... [*production requirement*] went from 420 to 700 ... they are intimating [*sic*] her into retirement ... pulled her into a hearing and asked her to sign her retirement papers.  *See* Exh. 4 M.T. Doe messages attached and incorporated as if fully restated.

## CRICKETS

31.     On 2/17/2020, <u>Ryan Perniciaro</u> neither closed my Harassment Hotline Complaint nor got back to Wells and me.  *See* Exh. 4 Due Date to close Hotline complaint, p.1.  *See* Exh. 1 CBA Vol. IV-A p. 526 (2019) In all cases, the complainant is advised when the case is closed.

32.     Around 2/19/2020, I and Group 1315-2-J, including C.H. Doe, completed the production quota, and I noticed nothing out of the ordinary, and like I normally did, I left work.

33.     On 2/19/2020, at 7:38 PM I was home with D.M. Doe, a Ford employee.

## IN 2020, 2021, AND 2023 FORD HIRED PROFESSIONALS TO ANALYZE WHAT HAPPENED ON FEBRUARY 19, 2020

34.    Baker & Hostetler LLP found, "during [*my*] shift...[*I*] took a break from working to make a post on [*my*] personal Facebook page...[*I*] threatened to shoot and kill [*my*] coworkers" (Cates, 2020, p. 2).

35.    Timothy J. Krantz found, concluded, or heard [*I*] posted on Facebook that [*I was*] going to line up people and [*I was*] going to shoot people at work at Ford (Krantz question, 2021, p. 10 Lines 17-21).

36.    Baker & Hostetler LLP found [*I*] posted threatening comments on a social media site about [*my*] peers while [*I*] was actively working in the plant (Linville, 2023, p. 4).

37.    Baker & Hostetler LLP further clarified that the Union Chairman and Union-Appointed Safety representative assisted victims and brought the threat to shoot and kill [*my*] coworkers (herein "Act of Threat") to <u>Ryan Perniciaro</u> (Cates, 2020, p. 2).

*See* Exh. 5 Ryan A. Cates and Ronald G. Linville emails, Ohio Industrial Commission transcript attached and incorporated as if fully restated.  Also see Exh. 20 p. 3 for a copy of the "Act of Threat.")

## RETALIATION

38.     On 2/19/2020 at about 7:38 PM, I answered a call from an Unknown Caller, Ryan Perniciaro who identified himself and told me our meeting tomorrow was canceled, my work badge had been deactivated, I was not permitted on Ford property until further notice, which would be next week.  *See* Exh. 6 Unknown Caller log.

## ME ON FEBRUARY 19, 2020

39.     In shock, around 7:50 PM I apologized to Local 2000 President Bill Samples, and told him that I had no idea why I was suspended; I was dumb and did not ask.  *See* Exh. 6 Samples text attached and incorporated as if fully restated.

40.     In bed, Terra Phillips alerted me of an "Act of Threat," around 10:42 PM, I got out of bed, logged into Facebook, deleted it to prevent any potential issues, and returned to bed.  *See* Exh. 6 Phillips text attached and incorporated as if fully restated.

## CHARACTER ASSASSINATION FEBRUARY 20, 2020

41.     At OHAP, at 10:14 AM, a couple of people over where J.L. Doe was working said [*I*] got escorted out of the plant.

42.     At home, shocked by J.L. Doe's report, I complained to the City of Lorain Police Department that someone hacked [*my*] Facebook and is making threats in [*my*] name.

43.     I absolutely and unequivocally did not threaten to shoot and kill people.

44.    At 5:04 PM, Terra Phillips sent me a screenshot she took of the "Act of

Threat."

*See* Exh. 6 J.L. Doe Texts and the City of Lorain Police Department Incident

Report No. 2020-00006276 are attached and incorporated as if fully restated.

## PERNICIARO INTENTIONALLY CONNECTED A FACEBOOK POST TO MY JOB AND MANUFACTURED STATEMENTS FORD USED AGAINST ME

45.    Around 2/25/2020, I arrived at Ford at 9 AM, where I was escorted to the LR

conference room by Mr. Security Guard and Tanya de Almeida.

46.    During the hearing or interrogation, I did not have a criminal defense lawyer

to help me answer the questions Ryan Perniciaro asked about work and social

media including the meaning of the "Act of Threat," its timing, and potential

implications for coworkers.

47.    I explained that I had no recollection of posting the threat and suggested that

my social media account might have been hacked, voicing feelings of

marginalization and concerns about inhumane treatment in the workplace.

48.    After the hearing, Ryan Perniciaro sent me home on suspension, escorted to

the gate by Mr. Security Guard.  *See* Exh. 6 voicemail transcript, the 2/25/2020

document Perniciaro created and issues i.e., wrong Employee ID No., uncertain,

ambiguous, and confusing line of questioning, edits in progress, p. 2 TS initials

variate from pp. 1 and 3-6, and see p. 6 – I am almost certain Mary retired on or

about 2/13/2020 so it makes no sense that I would be concerned "they" tried "to discipline" her on 2/25/2020. Exh. 6 is attached and incorporated as if fully restated.

## RETALIATION DURING COVID-19

49. Around 3/2/2020, at 3 PM Ryan Perniciaro needed me and accused me of violating the plant rule against an "Act of Threat," discharged me, and terminated one hundred percent of my economic support at the onset of the COVID-19 Pandemic. *See errors*: employee ID No., immediate supervisor Steve Jaeger, and my missing signatures, false vague fact, and referring to me as Mrs.

50. Around 3/2/2020 at 3:44 PM former Ford employee Myra Wilson told me that she experienced being a victim of a threat [*made by Paul Woolfork*], she involved the police, and Ford fired her instead of the perpetrator.

51. In mid-March 2020, I received copies of my discharge documents from Local 2000 Financial Secretary Joe Hrbar and Ford converted 77 employees to "In-Progression" paying $18.41 per hour.

(*See* Exh. 6 Voicemail Transcript, 4600 Disciplinary Action Report Ryan Perniciaro manufactured, Wilson messages, Grievance No. JW20TS and Herb Bennett Facebook post attached and incorporated as if fully restated.)

## EMPLOYMENT HISTORY AND PERFORMANCE

52.     Ford accommodated me before and after 2/8/1993, given that I transferred to an inspection position and took six weeks of unpaid birth-related leave.

53.     Returning from my maternity leave, I carried on working with Group No. 8810 [4] until I transferred to Unit 1 and worked with Group Nos. 0660, 1310, and 6510.  *See* Occupational History entry dates 7/2/02 through 11/19/07.

54.     Ford assigned us global identification numbers.  My GID is 000887871. (*See* Ex. 2 – Live Birth Verification, Zone H Card, my Ford GID, and Occupational History are attached and incorporated as if fully restated.)

## FORD COMPENSATED US BASED ON OUR ABILITY TO LEARN AND PERFORM JOBS

55.     Under the MOA, to my knowledge Ford decided when we moved from Level I to Level IV pay based on our ability to perform 33 to 100 percent of automobile assembly work within our team.  *See* Exh. 1 Hourly Classification and Rate Agreement, Appendix C, p. 179 (2003).

---

[4] Mike Bartone, Ken Beach, John Bittman, Kevin Cogar, Missy Cooper, Tom Csinsack, Ron Darrow, Paul Dziak, Greg Ford, Jerry Glass, Jerome Howard, Joseph Lautner, Don Meyer, Glenn Mortimer, Paul Nickel, Steve Olander, Paul Pellittieri, John Pezold, Mark Ratcliff, Tim Sheridan, Carl Spataro, Todd Upton, Larry Wegand, Eric Weitzel, and Janette Cogar, Missy Cooper, Coleen Donovan, Mary Gage, Felicia Gonzalez, Beth Huffman, Angie Joplin, Shelly Koutsopoulos, Sophia Langer, Scott Phillips, Pam Reid, Joleen Rogowski, Terra Sobolewski, Michelle Tiffan, Kim Valentine, Beth Vejas, Lori Vietzen, Paula Weaver, and hundreds subjected to the same CBA, Rules, Regulations, Grievance and Arbitration procedures as me.

56.     Ford moved me from Level I to Level IV by 10/15/99, or seven years. I do
not know if 7 years to advance from Level I to IV was typical. *See* Exh. 2
Occupational History p. 2 entry date 10/15/99.

## WE STARTED ALLEGING FORD VIOLATED OUR LEGAL RIGHTS

57.     I worked with Ford employees Anthony Zahuranec, Jerry Donovan, Rich
Schultz, and others.

58.     As far as I know, we worked under identical CBA, Rules, Regulations,
Grievance, and Arbitration Processes.

59.     Around 8/15/2005, Jerry Donovan filed policy Grievance No. MD00010
protesting management's unilateral decision to terminate our MOA (PRB Case
Nos. 1526 and 1542, 2006, p. 10).

60.     UAW International Representative Nick Parente facilitated Ford's action
and withdrew Grievance No. MD00010 (PBR Case Nos. 1526 & 1542, 2006, p.
15).

61.     Around 6/9/2005, Zahuranec, Donovan, and Schultz asserted that our
federally protected collective bargaining representation rights and process were
violated as demonstrated in *Case No 1:05-CV-01588* in this district Court.

62.     To my knowledge Zahuranec, Donovan, Schultz, Parente, and members of
the Public Review Board continued working or retired.

## I WAS A COMPETENT AUTOWORKER

63.    I *earned* a promotion in or around December 2007, Job Bid 1885.

64.    I *worked* with other Group No. 9289 [5] Lift Truck Operators.

65.    Group No. 9289 Lift Truck Operators worked under supervisors.[6]

66.    I established an 18-year relationship with Ford at age 39.

67.    In 2010, a Stock Supervisor (a) removed me from Job No. EA0014 after

three years, (b) added work to the day shift Operator Greg Diederich and my

replacement Ron Doe, and approximately one month later (c), returned me to Job

No. EA0014 documenting the move was an error.  *See* Exh. 2 occupational history

report p. 2 entry date 9/1/2010.

68.    I do not know how many autoworkers, females, or people Ford moves in

error.

### ABUSE BASED ON MY SEX AND AGE – NEGLIGENT
### SUPERVISION

---

[5] Ali G. Alawi, Ken Beach, Dane Bethard, Ed Brezina, Bill Brown, Eric Brummitt, Tony Contreras, Gene Courtney, Justo Delgato, Greg Diederich, Doug Dunn, Jason Fada, Griz Doe, Ed Guggenbiller, John Habeck, Carl Hill, Paul Homer, Gary Koleno, Paul Landman, Jim Murray Sr., Donnie Nemitz, Todd Newsome, Dave Orama, Frankie Pagan, Ron Palmer, Scott Phillips, Rabbit Doe, Ron Palmer, Marvin Rios, Ken Salmons, Jerry Sanchez, Sid Doe, Craig Smith, Matt Stafford, Chris Survance, Turk Doe, Ron White, Teddy Williams, and Tiara Krieg, Bobbi May, Michelle Tiffan, Kim Valentine, and Debbie Wiley, and others.

[6] Safety Engineer Randy Dougall, Charles Oley, John Grasso, Charlie Lough, Pete Shimrock Jr., Michael Gerken, Marco Sansotta, Clarence Trent, Tony Paul, Chris Habermehl and Labor Relations ("LR") Staff Mary Jo Turnley and Chris Matejcik, collectively "Stock Supervisors."

69.     On or about 2/4, 3/2, and 3/26/2011, Charles Oley and Mary Jo Turnley accused me of violating one Plant Rule against "Careless Workmanship," and penalized me.

70.     Accusations of careless workmanship humiliated me, caused emotional distress, and brought me to tears regularly.

71.     Around 4/14/2011, Oley and Turnley accused me of violating one Plant Rule against "Careless Workmanship," and penalized me.

72.     Around 4/19/2011, John A. Doe was severely injured by Industrial Lift Truck Operator John B. Doe.

73.     Michael P. Donovan, Bryan Brummitt, Dave Candelario, and Chris Ladikos filed one or more Discipline Grievance(s) on my behalf.

74.     Around 11/17/2011, Oley and Turnley accused me of violating the plant rule against "Careless Workmanship," and suspended me for three shifts without cause.

75.     Bill Samples filed one Discipline Grievance.

## UNSAFE AND HOSTILE WORK ENVIRONMENT

76.     Roy Escandon facilitated my right to be brought back from suspension.

77.     Mary Jo Turnley paid me 23 of 20 requested hours for November's harm.

78.     I don't know how much back pay Ford paid us between 2008 and 2011 when supervisors falsely accused us of violating rules.

79.    To my knowledge, Industrial Lift Truck Operators Sheila Johnson, Griz

Doe, Rabbit Doe, and Kim Valentine were removed (referred to as

"disqualification or DQ") from Group No. 9289 for safety incidents and John B.

Doe continued working with Group No. 9289 until retirement.

(*See* Exh. 7 copies of my Safety Permit, non-professional defamatory and

professional non-defamatory Ford emails, Grievance Nos. TS4142011 and

BS100007 are attached and incorporated as if fully restated.)

80.    In 2010 and 2011, I was unaware the Equal Employment Opportunity

Commission ("EEOC"), Ohio Civil Rights Commission ("OCRC"), National

Labor Relations Board ("NLRB"), and other agencies that enforced statutes, and I

believed my work conditions were normal.

## CONSTRUCTIVE DISCHARGE

81.    Around February 2012 because no prompt corrective action was made to my

work environment which I felt was hostile, I volunteered to return to my former

occupation Welder Assembly, Job Bid No. 2174. *See* Exh. 2 Occupational History

entry date 4/5/12.

82.    To my knowledge, Oley and Turnley were not held accountable for

falsification, job neglect, careless workmanship, or harassment.

83.    Oley, Turnley, Samples, and Escandon continued to work or retire.

84.     Between 4/5/12 through 2/20/19 I worked with Welder Assemblers Group Nos. 1319-3-A, 1315-3-A, 1315-2-A, 1315-2-L, 1316-2-A, 1315-2-E and 1315-2-B ("Body Shop").

85.     As far as I know, Body Shop worked under identical CBA, Rules, Regulations, Grievance, and Arbitration Procedures as Ford employees.

86.     Around 9/16/1996, employees were occasionally asked to work rather than take lunch, and around 11/3/2007, Ford preferred us to take breaks at designated times.  *See* Exh. 8 copies of Phillip A. Dubensky and Bill J. Dirksen's letters to us attached and incorporated as if fully restated.

87.     To my knowledge Dubensky, Dirksen, Ernest Lofton, and Bob King continued working or retired.

## FORD COMPENSATED US BASED ON OUR ABILITY TO WORK WITHOUT REST PERIODS – NEGLIGENT SUPERVISION

88.     After April 2012, supervisors started regularly compensating employees for agreeing to work without break and meal periods and reduced my and others' compensation when we did not consent to work through rest periods.

## ALLEGATIONS FORD CONTINUED VIOLATING OUR RIGHTS

89.     I worked with Ford employees Brian Maust, Roy Escandon, Mary Springowski, Steve Wonder, Michael P. Donovan, Will Marcum, and others.

90.    As far as I know, we worked under identical CBA, Rules, Regulations, Grievance, and Arbitration Procedures.

91.    On dates between 4/2/2012 and 9/28/2015

   a.    Brian Maust filed one Discrimination Grievance on my behalf.

   b.    Roy Escandon facilitated the removal of the Disciplinary Action Reports from my personnel file.

   c.    Mary Springowski submitted a statement to LR Staff, alleging that Steve Wonder created a hostile working environment for her and provided examples of Twitter tweets she considered threatening. *See* PRB Case No. 1721, p. 4 at https://prbuaw.org/2020/02/donovan-et-al-v-local-union-2000/ or 1721 Donovan et al. v. Local Union 2000 - Public Review Board (prbuaw.org).

   d.    Ford determined that Wonder's Tweets could not be connected to *his* job (PRB Case No. 1721, p. 6).

   e.    Despite the impact on Mary—fearful of going into the plant by herself—management did not find Wonder's Twitter posts to constitute threats of physical violence. *See* PRB Case No. 1721, pp. 11, 13.

   f.    Michael P. Donovan watched Ford ignore our contractual rights, our union become an enforcer for Ford instead of a representative for the

workers, and our contractual rights surrendered to Ford for three years, whatever Ford wanted Ford got.

g.      Many employees told Mary Springowski they felt put down, were uncomfortable opposing the status quo, intimidated, or retaliated against for a complaint or problem brought up.

h.      Will Marcum claimed that Ford strip-mined our rights and compensation for years.

i.      Around 2/7/2014, Brain Maust filed policy Grievance No. BM0146PO to do his job because our contractual rights were violated.

j.      Around 4/18/2014, I endorsed Michael Donovan on Facebook.

k.      Around 9/16/2014, Mary Springowski saw retaliation starting again.

l.      On or about 9/28/2015, the UAW Public Review Board ("PRB") held that Autoworkers' speech, short of vilification as prohibited by our Ethical Practice Codes, is protected. *See* PRB Case No. 1721, 2015, p. 13.

92.    Due to Ford's inaction, Mary Springowski transferred to a Ford plant further from her home. *See* PRB Case No. 1721, 2015, p. 15.

93.    To my knowledge Maust, Escandon, Springowski, Wonder, Michael P. Donovan, Marcum, and members of the PRB continued working or retired. (*See* Exh. 8 – Copies of campaign letters and Grievance No. BM0114TS are attached and incorporated as if fully restated.)

## OUR UNION ACTIVITY

94.     Beginning in August 2015, I and others participated in Union activities.  *See*
Exh. 8 Declaration, Facebook posts, pictures of me and Ford employees (Unknown
Photographers), my certificates, coworkers' speech, and plant bulletins attached
and incorporated as if fully restated.

## CONDITIONS SURROUNDING MY EMPLOYMENT

95.     Around mid-2015, I worked with Automation Cell Group 1316-2-A[7]
manually lifting heavy Commercial Truck B-Pillars and requesting to transfer to an
operation I could physically perform.  *See* Exh. 1 Article IV § 4(b), p. 20,
Appendix S Fitting Jobs to People, p. 291 and Exh. 9  F-650 B-Pillar attached and
incorporated as if fully restated.

96.     My requests were denied so I did my job by calling off (AWOL) and
reporting to the medical department every other day.  I lost wages and managed my
occupational diseases.

97.     Summer of 2015, Supervisor Doe allowed me to transfer.

98.     I started working with Welder Assemblers[8], specifically Group 1315-2-E.

---

[7] Gus Hatziantoniou, Joe Nemec, Dave Engle, and others, "collectively "Rear Corners."

[8] Larry Adkins, Al Brown, Gerald "Eddie" Cole, Louis Feliciano, David Glime, Rober Kurtz, Jack Layne, Richard Lence, Glenn Lewis, Michael Lindo, Arthur Lusane, Anthony Orseno, Michael Queen, Athanasios Sekoulopoulos ("Tommy"), Juan Torres Jr., Kenneth Wallace, and Angela Blair, Joyce Sharpey, Pam Tapper, Emma May, Denise Nemitz, supervisors Dwayne Brown, Shawn Ray, Sandy Eskins and others, collectively "Front Structure."

99. Our hours fluctuated, i.e., in October 2015 I worked 24.30 of the 40 hours Ford scheduled, and in September 2017 I worked 21.50 of the 40 hours Ford scheduled for us.

## FORD CONTINUED COMPENSATING US BASED ON OUR ABILITY TO WORK WITHOUT REST PERIODS

100. In around 2016, Shawn Ray began compensating typically male employees who agreed to start early, work through break and meal periods, and reduce mine and others' compensable hours when we started on time and refused to work during rest periods.

## WE ADDRESSED PAY INEQUALITY

101. In 2017, Shawn Ray agreed with Herb Bennett and me to pay me and four (4) employees manning our automation cell equally since it was beyond my control when any employee jumped on my job before I started on time, during rest periods, and after I left work.

## ORSENO GRIEVANCE AGAINST ME

102. On 12/13/2017, before 6:00 AM, Anthony "Tony" Orseno told me that he was complaining to Shawn Ray that I stopped him from doing my job, causing me to "shake," and drop a Ford F-650 Dash Pan on the floor. I contacted Mike "Stumpy" Stempowski. John Bado intervened, and later Shawn Ray told me not to interfere when Tony helped. I apologized and tried not to disrupt Orseno and

22

others while they helped.  *See* Exh. 9 Dash Pan and my text to Stumpy attached
and incorporated as if fully restated.

## HOSTILE WORK ENVIRONMENT

103.   I, including Group 1315-2-E employees, witnessed Jack Layne and Anthony
Contreras engage in a heated shouting match.

104.   I do not know if Layne or Contreras were sent home on suspension during
an investigation, who was interviewed one by one, or what LR did to correct our
hostile work environment.  To my knowledge LR Staff or a Supervisor accused
Layne of violating the plant rule against "Disrespect to Anthony Contreras," and
Layne lost one shift or less of wages.

## ANTICIPATORY RETALIATION AND INVASION OF MY PRIVACY

105.   Around 4/8/2018, LR Ariel MacDonald and Brian Maust questioned me and
several Group No. 1315-2-E employees individually because MacDonald believed
there may be "an issue brewing" and she asked personal questions about my
Facebook content, noting Maust mentioning, "posts about workplace bullying...that
some people took offense to."  MacDonald indicated that investigating my social
media content might be necessary (pp. 1-2) *See* Exh. 9 – 4/9/2018 document
MacDonald created is attached and incorporated as if fully restated.

106.   MacDonald and Maust's solutions to conflict and bullying aggravated our
hostile work environment, which I believed was normal.

107. Two main factors for retaliation are timing and evidence of ongoing antagonism. See *Abramson v. William Paterson Coll. Of N.J.*, 260 F .3d 265, 288 (3d Cir. 2001).

## HOSTILE WORK ENVIRONMENT

108. Around 9/27/2018, based on a conflict between Bob Kurtz, Orseno, and me fifteen minutes before our shift started, Jason Williams and MacDonald confidentially questioned me during our shift, and at 8:20 AM, MacDonald sent me home on suspension until further notice. *See* Exh. 9 – 9/27/2018 document MacDonald created attached and incorporated as if fully restated.

## DISCRIMINATION

109. Kurtz and Orseno were not sent home on suspension on 9/27/2018.

110. Around 9/27/2018, at 8:34 AM, I told Bill Samples what happened, expressing fear and stress. *See* Exh. 9 Samples texts attached and incorporated as if fully restated.

## FORD DENIED US DUE PROCESS

111. During my suspension, to the best of my knowledge, MacDonald and Williams privately interviewed employees who were not involved in the incident. They did not include Bob Kurtz—who confirmed this at 1:48 PM on or around 10/15/2019—or the remaining members of Group 1315-2-E in their investigation of our hostile work environment. Please refer to Exhibit 9 for Kurtz's text message,

which is attached and incorporated as fully restated. Also *See Taha v. Int'l Brotherhood Teamsters, Local 781*, <u>947 F.3d 464, 471</u> (7th Cir. 2020) Failure to present favorable evidence during grievance processes constitutes a breach of duty if that evidence probably would have brought about a different situation.

## HOSTILE WORK ENVIRONMENT

112. Around 10/1/2018, our "H-Line" was scheduled to work Friday and Saturday overtime at premium wages.

113. Around 10/3/2018, MacDonald paid me one hour to accuse me of violating the plant rule against "Disrespect to Tony Orseno." I served a suspension totaling two weeks, was humiliated, and lost regular and premium wages.

114. Around 10/4/2018, Williams filed one Discipline Grievance "due to the circumstances surrounding [*my*] work area," I believed I believed was normal. (*See* Exh. 9 OHAP Report, 4600 Disciplinary Action Report, Grievance No. JW10318TS, Statement of Earnings attached and incorporated as if fully restated.)

## BAKER & HOSTETLER LLP EXAMINED FORD RECORDS

115. Disciplinary problems history emerged on or around 10/3/2018 (Cates, p. 4 Footnote, 2020) also described as the final [] corrective actions [] issued for threatening co-workers [] cursing at and physically touching... (Linville, p. 3 last para., 2023). *See* Exh. 5.

## FORD INTENTIONALLY EXPOSED ME TO HOSTILE WORK ENVIRONMENT

116.    Around 10/9/2018, MacDonald returned me from suspension to work beside Orseno.

### I DID MY BEST TO KEEP FORD EMPLOYEES SAFE

117.    Around 11/18/2018, to avoid discipline progression or regression for disrespect or "threatening" workers (Linville), I exited my workstation when workers entered and expressed nervousness to Jason Williams, and others.

118.    To my knowledge, MacDonald, Orseno, Lou Feliciano, and Williams continued working or retired.

(*See* Exh. 9 my iPhone notes and messages to Jason Williams are attached and incorporated as if fully restated.)

### I VOLUNTEERED TO MOVE TO A HEALTHIER, SAFER ENVIRONMENT TO AVOID FURTHER HARM

119.    Around 11/23/2018, while grieving the loss of a dear worker [*Kevin Cogar*], wanting to find a better work environment, I accepted a transfer to the "7A project" to build OHAP's Super Duty and Kentucky Truck Plant ("KTP") Expedition and Lincoln Navigator A-Pillars.  *See* Exh. 9 Maust texts attached and incorporated as if fully restated.

120.    November 23 was a holiday under our Pay Plan.  I was not working on 11/23 or 11/24.

## MALCOLM L. DENISE CLARIFIED FORD POLICY

121.   No employee shall be moved indiscriminately...reassigning an employee within his classification for punitive reasons or as "retaliation" for having filed a grievance or other similar actions is not sanctioned by Ford (1964).  *See* Exh. 1 CBA Article VIII § 23 and Exh. 9 Letter to Ken Bannon attached and incorporated as if fully restated.

122.   To my knowledge, Malcolm L. Denise and Ken Bannon continued working or retired.

## RETALIATION

123.   From 11/26 to 12/21/2018, I was *reassigned, moved daily,* and *jumped on open jobs* under Supervisor Ray Metch, Shawn Ray, Michael Schaeffer, and Sandy Eskins ("Supervisors").

124.   General Utility ("GU") employees are *reassigned* and *moved daily* to *fill open jobs.*  GUs are trained, and experienced, and their hourly pay rate exceeds that of welder sub-assemblers.  *See* CBA Vol. I *Article VIII § 10.*

## FORD KEPT THE COMPENSATION I EARNED

125.   Supervisors compensated GUs for jumping on open jobs and did not compensate me for the equal work I performed from 11/26/2018 to 12/21/2018.

126. No Supervisor or LR Staff accused me of violating rules, or regulations, failing to follow instructions, or impeding the production process between 11/26/2018 and 12/21/2018.

127. To my knowledge, Ford did not address retaliatory or theft-related actions of Supervisors. *See* Exh. 1 CBA Appendix C § Rules and Regulations p. 6-7 (2015).

## RETALIATION

128. Ms. E.T. Doe told me she experienced conflict working in our Chassis Department, was suspended for two weeks, "taken off" her job after 15 years, reassigned to the Paint Department, and humiliated. *See* Exh. 9 E.T. Doe's message to me attached and incorporated as if fully restated.

## OUR 7-A EXPERIENCE

129. From 1/2 to 2/7/2019, I worked at our new automation cell "7-A" with Welder Sub Assemblers.[9]

130. Around 1/24/2019, Shawn Ray *accidentally* sent us home an hour early.

## FORD DELIBERATELY DISCIPLINED ME

131. Around 1/25/2019, Shawn Ray accused me of violating the plant rule against "Failure to Follow," because I missed thirty-two jobs or parts yesterday. I was

---

[9] Christine Shaw, Karoline Stallard, Denise Dobis Velez, James Afrates, Richard Barger, Bruce Edwards, Phillip Haller, Larry Harmych, Joey Martinez, Christopher Rose, Michael Velasquez, Marvin Wolcott, our Supervisor Shawn Ray and others, collectively "7-A Project or Group No. 1315-2-B."

humiliated and lost premium wages on 1/25 and 1/26. *See* Exh. 10 – Illegible

Disciplinary Action Report and Grievance Nos. CC343731 is attached and

incorporated as if fully restated.

132.   To my knowledge, Shawn Ray and Michael Wyatt took no punitive action

against Welder Sub Assemblers sent home early, missing 1 to 33 jobs or parts, or

for sitting and not staying at their workstations. *See* Exh. 11 for 8/15 and

8/16/2019 revelations.

133.   Shawn Ray and Mike Wyatt were not reprimanded for an "accident," theft-

related behavior, etc. referring to Appendix C § Rules and Regulations p. 6-7

(2015).  I believed that these working conditions were normal.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

134.   I was regarded as having an Acute Stress Reaction around 1/29/2019 and fit

to work. *See* Exh. 10 Melanie Meyer's objective observation attached and

incorporated as if fully restated.

## DISCRIMINATION

135.   On or around January 31, 2019, Shawn Ray and MacDonald alleged that I

violated the plant rule concerning "Failure to Follow," while allowing Emma to

return to work. This resulted in my humiliation and the loss of over a week's

wages. *See* Exh. 10 Disciplinary Report and Grievance No. SS13119.

136.    To my knowledge, no one I worked with asked permission before taking over another operator's tasks, switching, rotating, and lost wages exceeding one week for failure to follow instructions, as referenced in plant rules.  *See* Exh. 10 and 11.

137.    Around 2/5/2019, Shawn Salmons filed two Discipline Grievance(s) on my behalf.  *See* Exh. 10.

## FAILURE TO ACCOMMODATE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, RETALIATION

138.    On or about 2/72019, upon returning from suspension, Shawn Ray and Ariel MacDonald accused me of breaching a plant rule on "Impeding Production." They sent me home 2.5 hours early with full pay and reassigned me to other available work. I felt deeply humiliated.

139.    I was regarded as having Severe Depression around 2/7/2019.  *See* Exh 10 Physician Statement attached and incorporated as if fully restated.

140.    To my knowledge, no other employees were in the Labor Relations office mid-shift, accused of "Impeding Production," sent home early with full pay, reassigned to an entry-level position for displaying human behaviors, and later provided disability benefits—all within the same shift.

141.    I was regarded as having a Mental Health and Substance Abuse ("MHSA") condition Claim No. ST00368897 around 2/14/2019 because Ford Support Service

30

Representative Tanya de Almeida opened my claim for me. *See* Exh. 11

UniCare® Letter attached and incorporated as if fully restated.

142. To my knowledge Ray and MacDonald were not corrected for retaliatory

actions, etc. Refer to Reassignment Policy Letter Exh. 9.

143. Around 2/12/2019, Shawn Salmons filed a Discipline Grievance and

obtained a digital copy of previous disciplinary actions taken against me over two

years.

144. Around 2/18/2019, Shawn Salmons filed a Discrimination Grievance – Bob

Kurtz, and my statements are on file with UAW Civil Rights. (*See* Exh. 11

Discipline Report and Grievance Nos. SS2719TS and SS21219TS are attached and

incorporated as if fully restated.)

## FORD THREATENED TO HARM MY EMPLOYMENT STATUS

145. Around 2/25/2019, Human Resources ("HR") antagonized me, threatening

to terminate my employment record and benefits unless I reported to work within

five (5) days of an undated letter.

## DISCRIMINATORY DENIAL

146. Between 10/3/2018 and 2/19/2020, I was excluded from applying for all job

bids due to a disciplinary record created against me by MacDonald and Ray.

147.   Around 2/27/2019, Dearborn Disability Service Center paid me benefits and UniCare® confirmed my medical leave Claim No. ST00368897 was approved through 3/1/2019.

148.   Plant Manager Jason Moore explained the new automated cell 7-A sub-assembly performance was at the "best ever level."

(*See* Exh. 11 UniCare® and Ford letters, OHAP Reports, UniCare® Explanation of Benefits, OHAPpening Now, p. 1 attached and incorporated as if fully restated.)

149.   Around 3/4/2019, in response to HR's threat to my employment status, I returned to work.

## RETALIATORY HARASSMENT

150.   Around 3/4/2019, Michael Schaeffer disregarded Standards, Seniority, Health, Safety, and Ergonomic principles outlined in CBA Articles IV § 4(a) (p. 20), VIII § 23 (p. 86), X § 4 (p. 134), and Appendix "S" (pp. 274, 291) and told me replaced the least senior male employee, Eric Doe manually lifting commercial truck doors.

151.   I followed Schaeffer's instructions to prevent accusations of careless workmanship, disrespect, failure to comply, and hindering production, and I was not accused of such behavior.

152.   Retaliation exacerbated my Acute Stress Reaction, leading to increased tearfulness, while lifting commercial truck doors worsened my musculoskeletal

disorders (MSDs). The intentional infliction of emotional distress (IIED) further contributed to these issues. Following the advice of Health & Safety and Ergonomic Representatives Justo Delgato and Dave Cary, I promptly reported these concerns to the Medical Department.

153. I was regarded as having more than one MSD around 3/7/2019.

154. Delgato and Cary's advice led to AWOLs and loss of wages. (*See* Exh. 11 OHAP Reports of available work, Statements of Disability Benefits, and Return to Work Certification attached and incorporated as if fully restated.)

## RETALIATION AND DISABILITY DISCRIMINATION

155. HR threatened to terminate my employment record and benefits unless I reported to work within five (5) days of 3/28/2019.

156. For the first time in my life on or before 4/2/2019, I was diagnosed with moderate bipolar disorder and generalized social phobia.

157. Around 4/30/2019:

    a.    My 11-week MHSA Claim No. ST00368897 closed.

    b.    I returned to work.

    c.    Shawn Salmons and Steve Jaeger agreed that I was ergonomically fit to lift commercial truck doors with a hoist (ergonomic equipment).

158. Around 8/1/2019:

a.     John Bado gave me a copy of my digital Disciplinary Report, which showed inconsistent disciplinary actions and <u>no</u> record of attendance-related discipline.

b.     Bado informed me that I was deficient by one hundred hours for FMLA coverage.

(*See* Exh. 12 Ford Letter, Lab Requisition Order Form, Explanations of <u>11-Week</u> Disability Benefits, and UniCare® Letter, and Discipline Information attached and incorporated as if fully restated.)

## HOSTILE WORK ENVIRONMENT

159.  Around 8/15/2019 at work:

a.     I was frightened to use the restroom, experienced a menstrual cycle, and bled through my jeans, which left me feeling humiliated and tearful.

b.     John Bado and Brian Mitchell transported me to and from the medical department using Ford's buggy, where I reported my concerns to Nurse Angela.

160.  Around 8/15 and 16/2019, after work:

a.     My coworker Ms. D.V. Doe told me that 7-A production requirement increased fifteen (15) percent, flames were coming off her feet, management watched "us" (meaning she, C.S and K.S. Doe) like hawks for hours, the

robots were switched to one hundred (100) percent, and that I had been

clocked at 60 jobs an hour [*between 1/2 and 2/7/2019*].

(*See* Exh. 1 CBA Article IV § 4(b) Ford's obligation to 7-A are normal working

conditions.)

      b.     I asked C.S. Doe at 7-A for thoughts about targeting women. She told

      me that "they" tried to say I consistently produced sixty jobs an hour

      [*between 1/2 and 2/7/2019*].

(*See* Exh. 13 copies of D.V. and C.S. Doe's Facebook messages and texts attached

and incorporated as if fully restated.)

## FAILURE TO REASONABLY ACCOMMODATE

161.    Due to work conditions, I temporarily quit or went AWOL from around 8/22

to 9/4/2019. I lost wages.

## FORD THREATENED TO HARM MY EMPLOYMENT STATUS

162.    HR threatened me with termination and loss of seniority if I failed to report

for work or give a satisfactory reason for my absence within five (5) days of

9/3/2019. *See* Exh. 13 Ford's Letter attached and incorporated as if fully restated.

163.    Under the care of Said Haidar M.D., I opened my MHSA Claim No.

ST00387723 as of 9/5/2019, avoided termination and lost wages i.e., elimination

period.

## OUR COLLECTIVE BARGAINING AGREEMENT VIOLATED ME UNDER THE AMERICANS WITH DISABILITIES ACT, OHIO REV. CODE §4112.02 AND THE SOCIAL SECURITY ACT

164. Around 9/6 and 9/11/2019, because I was allegedly "disabled for 24 weeks," UniCare®, on behalf of UAW and Ford, subjected me to a Social Security Insurance Benefit evaluation under MHSA Claim No. ST00368897.

165. I was regarded as having MHSA conditions around 9/10/2019 – Claim No. ST00387723. *See* Exh. 13 UniCare® Letters and Statement of Benefits attached and incorporated as if fully restated.

## I ASSOCIATED WITH MYRA WILSON

166. Around 9/8/2019, I met former Ford employee Myra Wilson who to my knowledge and belief worked under the same laws, CBA, rules, regulations, grievance and arbitration procedures, supervision, and representation as me. LR Staff terminated Myra on 6/14/2014, and Myra's UniCare® Claim No. ST00215101 was paid from 7/18 to 7/28/2014.

## COERCED REINSTATEMENT

167. LR Staff brought Myra back on 8/20/2018 on a 12-month general waiver and LR Staff terminated Myra on 8/24/2018.

168. After 9/8/2019, I observed multiple grievances safeguarding Myra Wilson, and a letter from Michael P. Donovan dated 7/11/2019 stating he would not advocate for her. Wilson attempted to allege her civil rights were violated

evidenced in Case No. 1:19-CV-02238 in this district court. *See* Exh. 14 Discharge

Grievance No. BH0001, Myra's Statement of Benefits, Reinstatement Agreement,

Myra's Disciplinary Action Report, Discharge Grievance No. JW82418MW,

Donovan Letter attached and incorporated as if fully restated.

169.   To my knowledge and belief, LR did not terminate Larry Harymch, Robert

Kurtz, Denise Velez, Carrieanne Weland, Jim Henry, or others injured or ill given

CBA Vol. I, Article VIII § 30, pp. 91-2 Medical Leaves, Vol. I, Article X § 9, pp.

136-7 Equal Application, etc.

170.   Around 9/19/2019, UniCare® provided me with disability benefit payment.

171.   UniCare® confirmed my MHSA Claim No. ST00387723 was approved

through 10/16/2019. *See* Exh. 15 UniCare® documents attached and incorporated

as if fully restated.

## FAILURE TO ACCOMMODATE

172.   Around 10/15/2019 before 1:34 PM, I completed the process to return to

work from my disability leave tomorrow, confirmed by Meeka Hughes.

173.   Stacey Allerton clarified that

      a.  Ford corrects a small portion of abusively absent workers (p. 17).

      b.  Ford consistently applies the Attendance Program at all locations (p.

         17).

c.  Discipline progression is based on the most recent attendance

discipline penalty on record (p. 21).

d.  Before progressing to termination, Ford reprimands, warns and

suspends us for one (1) month (p. 23).

## FORD VIOLATED ME UNDER THE CBA, ADA, AND OHIO REV. CODE §4112.02 BY IMPOSING HARSHER ATTENDANCE POLICY PENALTY

174.  On 10/15/2019, LR Staff Meeka Hughes for Ford suspended me for one (1)

month for violating our attendance policy.

175.  I do not know how many enterprise-wide employees were suspended for 30

days with zero attendance discipline on record.

176.  Kelly Knight and John Bado filed one Discipline Grievance and one

Discrimination Grievance – statements are on file with UAW Civil Rights.

(*See* Exh. 16 Stacey Allerton Letter, my Return-to-Work slip, Disciplinary Action

Report, Grievance Nos. TS15KK and TS1022JB attached and incorporated as if

fully restated.)

## FAILURE TO PROVIDE REASONABLE ACCOMMODATION AND ENGAGE IN AN INTERACTIVE PROCESS

177.  Brian Maust sought to get me back on Monday 10/28 instead of 11/16/2019

and won.  He sought no back pay, compensatory or punitive damages.

178.   The EEOC seeks monetary relief, including back pay, and compensatory and punitive damages as demonstrated in *EEOC v. Wal-Mart Stores East, LP, Civil Action No. 5:23-cv-00218*.

179.   Around 10/1/2019 and 10/24/2019 I wrote the UAW National Ford Department ("NFD") and there was no action for the NFD to pursue regarding work issues (Gamble, 2019).

180.   Bill Samples and Herb Bennett withdrew Grievance TS1022JB to get my 2-week [*Disrespect to Tony Orseno*] discipline removed.

181.   Around 1/13/2020, before 2:29 PM, Jason Wells told me I was ineligible to sign bids due to a 2-week discipline on my record.  After 2:29 PM, I contacted Bill Samples, who told me to let him work on it.

(*See* Exh. 17 Brian Maust's 10/24/2019 text to me, Rory Gamble's letter, Bill Samples' 11/12/2019 text to me, and my 1/13/2020 text to Bill Samples attached and incorporated as if fully restated.)

182.   I believe my actions between 2/5/2020, and 2/12/2020, upset Ford, leading to my termination on 3/2/2020.

183.   On 3/3/2020, Jason Wells filed Discharged Grievance No. JW20TS.  *See* Exh. 18.

## COERCED MEDICAL RETIREMENT

184. Around 6/28/2023, Brian Maust, Union Chairman, reviewed Grievance No. JW20TS, sought to bring me back on medical retirement, asking me to explain to him what sparked my so-called outburst on 2/19/2020.

185. I relied on Brian Maust's assessment and statements about the grievance, medical retirement, and settlement.

186. Following Brian Maust's call, I emailed him to object, since I could not provide statements that I flew into a fictitious rage on 2/19/2020.

187. I emailed the EEOC Incident No. 230701-000033 believing that falsification and fraudulently applying for or collecting benefits were misconduct. *See* Exh. 19 Emails, EEOC Incident Report is attached and incorporated as if fully restated.

## FORD EMPLOYEES' CASES

188. To my knowledge, OHAP, Chicago Assembly Plant ("CAP"), Dearborn Diversified Manufacturing Plant ("DDMP"), and Chicago Stamping Plant ("CSP") operated under the same UAW-FORD CBA, rules, regulations, grievance, and arbitration procedures.

189. Ford employed Dee Dispenza, Myra Wilson, Alicia Ratcliff-Marzio, David Brown, Bill Collins, Shawn Hoover, Bob Kurtz, John Pena, Charlie Robbins, Sheila Johnson, and Todd Upton at OHAP, Shranda Campbell-Salahuddin at CSP, Billy Cowart at CAP, Michelle Cowan at DDMP, terminated them for alleged rule violations and brought them back (*See* Declaration 19).

## THE U.S. – UAW AGREEMENT

190.   The United States and the UAW agreed that honest and duly elected officials

of the UAW are best equipped to ... enforce said agreements vigorously and

aggressively as demonstrated in *United States v. International Union, United*

*Automobile, Aerospace, and Agricultural Implement Workers of America*, No. 20-

cv-13293 (E.D. Mich.) p. 109.

## THE MAUST CASE

191.   Ford employed Brian Maust at OHAP and discharged him.

192.   Maust lodged a grievance with the UAW.

193.   The UAW prosecuted Maust's grievance challenging termination and sought

his reinstatement culminating in binding arbitration on 6/20 and 6/21/2024.  his

right to be brought back may be enforced in or after September 2024.

(Exh. 19 emails, OHAP bulletin, and Brian Maust's letter are attached and

incorporated as if fully restated.)

## UNION APPLICATION OF REPRESENTATION

194.   Between 8/20/2020, and 5/27/2024, I relied on union representation, and my

case is currently being handled by the UAW Appeals Department (Exh. 20

Declaration, letters, emails, "Act of Threat," are attached and incorporated as if

fully restated).

## I SEARCHED FOR A LICENSED PROFESSIONAL AT MY OWN EXPENSE

195.  Between 3/6/2020 and 8/1/2024, I sought representation but could not secure a private attorney who handles legal matters (Exh. 21 Declaration, letters, and emails are attached and incorporated as if fully restated).

## HARM ASSOCIATED WITH RETALIATORY DISCHARGE

196.  At least between 2/7/2019 and the date of this complaint, I suffered extensive harm (Exh. 22 Declaration and evidence attached and incorporated as if fully restated).

## ADMINISTRATIVE REMEDIES ASSOCIATED WITH FORD

197.  I exhausted portals, agencies, and investigators who evaluated the claims I filed since Ford terminated our relationship (Exh. 23 Declaration and evidence attached and incorporated as if fully restated).

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, I respectfully request that this Court provide the following relief:

(a)  Enter a judgment in the Plaintiff's favor and against Defendant,

(b)  Award the Plaintiff her actual damages suffered, including lost wages, back pay, benefits, and other damages,

(c)     Award Plaintiff compensatory damages, including for her humiliation, pain, suffering, and emotional distress,

(d)     Award Plaintiff punitive and/or exemplary damages against the Defendant,

(e)     Enjoin Defendant and its supervisors, managers, employees, and agents from violating Plaintiff and our rights and from their continued harassment, intimidation, and discrimination against Plaintiff and others,

(f)     Award the Plaintiff pre-judgment interest, and statutory penalties,

(g)     Award the Plaintiff reasonable costs for her self-study endeavors, attempts to access administrative remedies, and time spent seeking legal counsel,

(h)     Award the Plaintiff front pay and other damages, and

(i)     Grant Plaintiff further relief as this Court deems appropriate and just.

PLAINTIFF DEMANDS A TRIAL BY JURY.

Respectfully submitted,

Tamara Sobolewski, Pro Se Plaintiff
1002 Dakota Avenue
Lorain OH 44052
(440) 452-1982     8-13-2024